**THOUGHTWORKS, INC., a Delaware corporation, Plaintiff,**

v.

**SV INVESTMENT PARTNERS, LLC, Schroder Ventures U.S. Fund L.P. 1, Schroder Venture U.S. Fund L.P. 2, Sitco Nominees Ltd. VC 04001 and SV (Nominees) Limited, Defendants.**

C.A. No. 1695–N.

Court of Chancery of Delaware, New Castle County.

Submitted: April 13, 2006.
Decided: June 30, 2006.

Kenneth J. Nachbar, Esquire, S. Mark Hurd, Esquire, Morris Nichols Arsht & Tunnell LLP, Wilmington, Delaware; Brian D. Roche, Esquire, Christopher R. Clark, Esquire, Michele L. Walton, Esquire, Sachnoff & Weaver, Ltd., Chicago, Illinois, Attorneys for the Plaintiff.

Bruce L. Silverstein, Esquire, Danielle Gibbs, Esquire, Karen Lantz, Esquire, Young Conaway Stargatt & Taylor, LLP, Wilmington, Delaware; Daniel M. Abuhoff, Esquire, Justin P. Smith, Esquire, Eliza M. Sporn, Esquire, Debevoise & Plimpton LLP, New York, New York, Attorneys for the Defendants.

## OPINION

LAMB, Vice Chancellor.

A minority investor seeks to redeem its preferred stock pursuant to the company's certificate of incorporation. The company brings this action seeking a declaratory judgment that the charter allows it to postpone its redemption obligation indefinitely until the board determines it has excess funds beyond those needed for working capital purposes. In addition, the company asks this court to declare that the

charter does not require the board to obtain the consent of the minority investor before it can increase its bank line of credit. The court, after trial, determines that the plain language of the charter requires the company to immediately redeem its preferred stock using any legally available funds. The court also concludes that the charter obligates the company to obtain the consent of the preferred holders before increasing its line of credit.

## I.

### A. *Background*

Toward the end of 1999 and in early 2000, the plaintiff, ThoughtWorks, Inc., a privately held information technology professional services firm that develops and delivers custom business software applications, sought outside minority investors to expand its business and facilitate an initial public offering.[1] ThoughtWorks engaged S.G. Cowen Securities Corporation, an investment bank, to assist it in locating such investors. In January 2000, ThoughtWorks and S.G. Cowen presented SV Investment Partners, LLC ("SVIP"), a private equity investment firm, with a confidential offering memorandum for a $25 million private equity investment.[2] SVIP invested approximately $26.6 million in ThoughtWorks and received 3,137,954 shares of ThoughtWorks's Series A convertible preferred stock.[3] SVIP invested in Thoughtworks in large part because it was attracted to the possibility of an IPO in the near term. Both parties believed that ThoughtWorks would in the next few years undertake an initial public offering that would allow SVIP to cash out its investment.[4]

To guard against the possibility that such transaction would not occur, the parties negotiated a provision in the ThoughtWorks corporate charter for the mandatory redemption of SVIP's preferred stock after five years.[5] In effect, on April 5,

1. Joint Pretrial Order ("PTO") 1–2, 10. ThoughtWorks is a Delaware corporation with its principal place of business in Chicago, Illinois. ThoughtWorks is a privately held consulting firm in the business of developing enterprise-wide custom software applications for its clients, which are generally Global 1000 companies.

2. Defendant SV Investment Partners, LLC was formally known as Schroder Venture Partners LLC. SV Investment Partners, LLC is a limited liability company organized under the laws of the state of New York with its principal place of business in New York, New York. SV Investment Partners, LLC is the investment advisor to Schroder Venture Managers Inc., which manages Schroder Ventures U.S. Fund L.P. 1, Schroder Ventures U.S. Fund L.P. 2, SITCO Nominees Ltd. VC 04001, and SV (Nominees) Limited. Defendant Schroder Ventures U.S. Fund L.P. 1 is a limited partnership organized under the laws of the State of Delaware with its principal place of business in Hamilton, Bermuda. Defendant Schroder Ventures U.S. Fund L.P. 2 is a limited partnership organized under the laws

of the Cayman Islands with its principal place of business in Hamilton, Bermuda. Defendant SITCO Nominees Ltd. VC04001 is a company limited by shares and organized under the laws of Bermuda with its principal place of business in Hamilton, Bermuda. Defendant SV (Nominees) Limited is a limited company organized under the laws of the Channel Islands with its principal place of business in Guernsey, Channel Islands. Since SV Investment Partners, LLC manages the interests of all of the defendants, the defendants will be collectively referred to in this opinion as "SVIP."

3. SVIP held more than 51% of the outstanding shares of the company's preferred stock.

4. SVIP believed it could position the company for an IPO within 12 to 18 months of completing the investment.

5. As part of the transaction with SVIP, ThoughtWorks, which was originally an Illinois corporation, reincorporated in Delaware and filed an amended and restated charter.

2005 (five years from the closing date), SVIP had a right to put, or have the company redeem, all of its preferred shares for approximately $43 million. Article IV, Section 4(a) of the charter states that:

> On the date that is the fifth anniversary of the Closing Date, if prior to such date, the Company has not issued shares of Common Stock to the public in a Qualified Public Offering ... each holder of Preferred Stock shall be entitled to require the Corporation to redeem for cash out of any funds legally available therefor and which have not been designated by the Board of Directors as necessary to fund the working capital requirements of the Corporation for the fiscal year of the Redemption Date, not less than 100% of the Preferred Stock held by each holder on that date.[6]

The "Redemption Date" is defined as "the date that is the fifth anniversary of the Closing Date (as such date may be postponed pursuant to Section 4(c) hereof)." [7]

In addition, the parties agreed that ThoughtWorks would have to obtain consent from the holders of the majority of the preferred stock to conduct certain business transactions. Article IV, Section 5 of the corporate charter sets out those situations in which the consent of the majority of the preferred stockholders is needed before the company can act.[8] Spe-cifically, Section 5(j) provides that the consent of the holders of the preferred stock is needed before the company can:

> [E]nter, or allow any subsidiary to enter into, any contractual arrangement providing for the payment of $500,000 or more per year by either party thereto and that is outside the ordinary course of business or that was not contemplated by the Corporation's annual budget.[9]

The provisions regarding the preferred stockholders' consent rights were not heavily negotiated between the parties. Indeed, at trial, neither party provided testimony or other parol evidence concerning the negotiation of these provisions.

## B. *SVIP's Redemption Rights Are Triggered*

In late 2000, shortly after SVIP invested in ThoughtWorks, the demand for internet service providers, such as ThoughtWorks, declined dramatically. Due to the lack of demand for its services, ThoughtWorks suffered financially and it was clear to the parties that an initial public offering was no longer a realistic possibility for the company. In the summer of 2003, ThoughtWorks became concerned that it may not be able to meet its April 2005 redemption obligation to SVIP. To address this concern, the board of directors put Daniel Goodwin, the vice president and general counsel of ThoughtWorks, and

---

6. JX 14.

7. *Id.* The closing date of the investment was April 5, 2000.

8. PTO 33; JX 14. Section 5 provides in pertinent part that the company is required to obtain consent from the majority of the holders of the preferred stock in order to, among other things, (i) reclassify any common stock into shares having any preference or priority as to the payment of dividends or the distribution of assets superior to or on parity with any such preferences or priority of the proffered stock, (ii) approve the annual operating and capital budgets of the corporation in certain circumstances (iii) acquire or make an investment in any non-wholly owned corporation, limited liability company, partnership, trust or other entity for consideration having a value greater than $500,000, or enter into a joint venture or acquire or make a material investment in a business unit, or acquire assets, for consideration having a value greater than $500,000.

9. *Id.*

Eric Loughmiller, the chief financial officer of ThoughtWorks, in charge of dealing with the redemption obligation. Loughmiller was named the chair of what the board called "Solving the Put Program," or the "STP Program," which was part of the ThoughtWorks global leadership team.

Goodwin and Loughmiller examined the finances of ThoughtWorks and concluded that, while the company was rebuilding and experiencing a financial turnaround, it most likely would not be able to make a payment of approximately $43 million to SVIP at the expiration of the five-year investment period. ThoughtWorks informed SVIP that it would not be able to meet the redemption obligation, and, on November 12, 2003, ThoughtWorks and SVIP met to discuss the matter. At that meeting, ThoughtWorks made a power point presentation to SVIP entitled "Solving the Put Issue" which proposed delaying the exercise of the put for additional consideration so that ThoughtWorks could "maximize the potential return for the holders of redeemable preferred stock without putting the company up for sale now." [10]

On November 17, 2003, the Thought-Works board met and identified "Solving the Put" as one of the company's top priorities. On January 24, 2004, Loughmiller, as chair of the STP Program, made a confidential presentation to the members of the global leadership team where he reviewed the actions ThoughtWorks was taking to address the looming put obligation. In that presentation, Loughmiller discussed obtaining funds through an issuance of high yield bonds to pay for the redemption.

In the summer of 2004, ThoughtWorks, with SVIP's agreement, engaged William Blair and Company, an investment banking firm, to raise money in the debt markets. SVIP agreed to postpone the redemption date until July 5, 2005, while William Blair sought to raise the necessary capital.[11] William Blair prepared an information memorandum on behalf of the company and distributed it to 45 potential lenders. In the spring of 2005, William Blair presented the proposals it received from the lenders in a joint meeting with the company and SVIP. The results, however, were disappointing. Although the company expected that it could borrow $30 million, the largest proposal it received was for $20 million. Faced with the reality that ThoughtWorks could not raise enough cash to satisfy the approximately $43 million redemption obligation, ThoughtWorks made a formal offer to the preferred stockholders to redeem their stock for $12.8 million in cash. Some of the preferred stockholders accepted the company's proposal; however, SVIP did not respond to the offer.

On July 1, 2005, ThoughtWorks held a special board meeting at which it concluded that the company did not have enough cash to make a redemption payment to SVIP,[12] and determined that "the funds required to fund the working capital re-

10. JX 26; Tr. 45–49, 189–90; see also JX 25; Tr. 95–96. Goodwin wrote an internal memorandum that included specific proposals for the preferred stockholders' put option. One of the proposals was to pay the holders of the preferred stock $1 million for the right to delay the put for one year.

11. On May 19, 2005, and May 20, 2005, SVIP sent letters to ThoughtWorks invoking its right to require ThoughtWorks to redeem its shares of the preferred stock on July 5, 2005. PTO 47.

12. Loughmiller reviewed for the board the previous day's cash balance, which was approximately $1.3 million, as well as the company's obligation in the next coming days, including $1.2 million in payroll and $200,000 due to MasterCard.

quirements of the Company [were] an amount in excess of available cash on July 5, 2005." [13] Therefore, the board decided not to redeem the preferred shares on July 5, 2005.[14]

### C. ThoughtWorks Seeks A $10 Million Line Of Credit

In August 2005, ThoughtWorks sought an increase in its line of credit from $3 million to $10 million to manage its cash flow so that it could timely pay its employees and other expenses.[15] SVIP wrote a letter to ThoughtWorks stating that it did not consent to an expansion of Thought-Works's credit line. According to SVIP, pursuant to ThoughtWorks's certificate of incorporation, any such incurrence of indebtedness by ThoughtWorks required the consent of SVIP since it held more than 51% of the outstanding preferred stock. Without seeking or obtaining consent from SVIP, ThoughtWorks negotiated with La-Salle Bank the terms of the $10 million line of credit, during which time, LaSalle temporarily increased the company's line of credit from $3 million to $5 million.[16]

SVIP objected to both the $5 million and $10 million increased lines of credit.[17] On October 5, 2005, SVIP contacted LaSalle to inform it that ThoughtWorks was required under its charter to obtain the consent of a majority of the holders of the preferred stock before it could enter into a line of credit. SVIP told LaSalle that it would pursue litigation for breach of that contractual protection and for interference with a contract if the bank moved forward with ThoughtWorks's proposed increased line of credit. As a result, LaSalle did not move forward on the $10 million line of credit.

ThoughtWorks did not have the necessary funds to fulfill its $43 million redemption obligation. Unable to delay the put right and desperate to avoid entering into a transaction that could result in either substantial dilution of its existing equity or a complete sale of the company, Thought-Works brought this action on October 6, 2005, asserting, for the first time, that its corporate charter allows it to postpone the payment of its redemption obligation beyond 2005.[18] Specifically, ThoughtWorks seeks a declaratory judgment that Article IV, Section 4 of the charter allows it, in years after the fiscal year of the redemption date, to set aside an amount designated by the board of directors as necessary

---

**13.** PTO 48.

**14.** After ThoughtWorks decided not to redeem SVIP's preferred stock, SVIP caused a significant client of ThoughtWorks, International Decision Systems, Inc. ("IDS"), a leasing software company that is owned and controlled by SVIP, to stop paying ThoughtWorks for its services. ThoughtWorks told IDS that if it was not paid, ThoughtWorks would terminate the services it was currently providing. In response, IDS brought a lawsuit against ThoughtWorks in the District Court of Minnesota arguing that it was entitled to a temporary restraining order to force ThoughtWorks to continue providing services to IDS. The presiding judge in that case denied the requested TRO and found unreasonable IDS's refusal to pay a significant portion of what it owed to ThoughtWorks. JX 66; Tr. 64.

**15.** The $10 million line of credit was secured by ThoughtWorks's accounts receivable.

**16.** ThoughtWorks did not seek or obtain approval from the holders of the preferred stock for the expansion of the line of credit to $5 million.

**17.** SVIP thought the $10 million line of credit was excessive and well beyond what it thought was appropriate for the purposes of running the company.

**18.** Tr. 54, 100–103. Goodwin testified that "the ultimate goal was to become an employee-owned and employee-controlled company." The put right had the potential to threaten the company's independence.

to fund the working capital requirements of the company when determining the funds available to satisfy its redemption obligation.

In addition ThoughtWorks asks this court to declare that it may enter into a $10 million line of credit with LaSalle without obtaining the consent of SVIP. ThoughtWorks argues that Article IV, Section 5 of the charter does not provide SVIP with consent rights over the incurrence of debt, including the extension of an operating line of credit. According to ThoughtWorks, SVIP is improperly seeking to extend its consent rights under the charter beyond their terms to interfere with ThoughtWorks's operations so that ThoughtWorks will be left with no alternative but to enter into a sale or merger transaction to raise sufficient funds to satisfy its obligation to redeem SVIP's preferred stock.

The court granted the motion to expedite proceedings and held a two-day trial which began on February 4, 2006, followed by post-trial briefing.

## II.

■ ThoughtWorks argues that Section 4(a) of the charter provides it with an ongoing right to exclude funds designated as working capital by the company's board of directors from funds otherwise legally available to redeem the preferred stock. SVIP argues, to the contrary, that under the charter, ThoughtWorks is only entitled to a working capital set aside during the fiscal year of the redemption date, i.e. fiscal year 2005. Thus, SVIP claims, ThoughtWorks was obligated, beginning in fiscal year 2006, to use all of its legally available funds to redeem the preferred stock. Each party contends that the un-

ambiguous language of the charter and the negotiation history between the parties support its interpretation.

Section 4(a) of the charter provides SVIP with a right to put its preferred shares to the company in the event the company does not complete an initial public offering within five years of its investment. Section 4(a) states in pertinent part that the preferred stockholders shall be entitled to require the company to redeem its stock for cash "out of any funds legally available therefor and which have not been designated by the Board of Directors as necessary to fund the working capital requirements of the Corporation *for the fiscal year of the Redemption Date.*"[19] The "Redemption Date" is defined as "the date that is the fifth anniversary of the Closing Date (as such date may be postponed pursuant to Section 4(c) hereof)."[20] There is no dispute that SVIP postponed the redemption date pursuant to Section 4(c) and put its stock to the company on July 5, 2005. Because, on that redemption date ThoughtWorks had insufficient funds to redeem all (if any) of SVIP's preferred stock, Section 4(d) states that the redemption requirement shall be continuous such that "funds available pursuant to Section 4(a) shall be applied therefor until such requirements are fully satisfied."[21]

ThoughtWorks argues that Section 4(d) allows it to set aside funds needed for working capital in fulfilling its redemption obligation. ThoughtWorks contends that, since it had insufficient funds to redeem SVIP's stock in 2005, Section 4(d) provides that funds available pursuant to Section 4(a) shall be continuously applied until the obligation is fully discharged. Thus, it argues that in determining what funds the

19. JX 14 (emphasis added).

20. *Id.*

21. *Id.*

company has available to satisfy the redemption obligation, ThoughtWorks must apply the same methodology provided for in Section 4(a), *i.e.*, all legally available funds except those determined by the board as necessary to meet the company's working capital requirements. Simply put, ThoughtWorks argues that it has the right, ongoing from year to year, to exclude necessary working capital from the funds available to pay the redemption obligation.

SVIP takes the position that Section 4(a) entitled ThoughtWorks to set aside working capital requirements from the calculation of funds available to redeem the preferred stock only during fiscal 2005, the year it put the shares for redemption. It argues that the capitalization of the term "Redemption Date" in Section 4(a) supports their interpretation that ThoughtWorks can only take required working capital into account during the particular fiscal year of the redemption date. Thus, SVIP argues that ThoughtWorks could only set aside its working capital in 2005, and must now redeem the preferred stock using any legally available funds.

## III.

▆▆▆ It is well settled that if the terms of a contract are clear, the court must accord the language its ordinary meaning.[22] "If a contract is unambiguous, extrinsic evidence may not be used to interpret the intent of the parties, to vary the terms of the contract, or to create an ambiguity."[23] However, if the contract terms are ambiguous on their face, the court may consider parol evidence to determine the true meaning of the parties' intent when they entered into the contract.[24] "To demonstrate ambiguity, a party must show that the instruments in question can be reasonably read to have two or more meanings."[25] Contractual language is not ambiguous in a legal sense merely because the parties disagree on its meaning.[26]

### A. The Redemption Provision

ThoughtWorks's contention that Section 4(d) gave it the right to continually set aside working capital in fulfilling the redemption obligation is unavailing. Section 4(d) states that, if at any time after the redemption date, the redemption obligation "shall not be fully discharged," "funds available pursuant to Section 4(a) shall be applied therefor until such requirements are fully discharged."[27] Under Section 4(a), it is clear that the working capital set-aside is only available during the fiscal year of the redemption date. The reason Section 4(d) does not simply refer to funds "legally available" but instead refers back to Section 4(a) appears to stem from the fact that the continuing nature of ThoughtWorks re-

**22.** *Eagle Indus. v. DeVilbiss Health Care,* 702 A.2d 1228, 1232 (Del.1997) (holding that "contract terms themselves will be controlling when they establish the parties' common meaning so that a reasonable person in the position of either party would have no expectations inconsistent with the contract language").

**23.** *Id.* at 1232; *see also Capital Mgmt. v. Brown,* 813 A.2d 1094, 1097 (Del.2002); *Halliburton v. Highlands Ins. Group,* 811 A.2d 277, 279–80 (Del.2002).

**24.** *Id.; Peden v. Gray,* 2005 WL 2622746 at *2, 2005 Del. LEXIS 389 at *6–7 (Del. Oct. 14, 2005) (holding that parol evidence is admissible to resolve a contractual term that is ambiguous).

**25.** *Harrah's Entm't v. JCC Holding,* 802 A.2d 294, 309 (Del.Ch.2002).

**26.** *Id.*

**27.** JX 14.

demption obligation included the remainder of fiscal 2005 beyond the redemption date. Thus, for example, if ThoughtWorks had experienced such positive developments in the second half of fiscal 2005 that the legally available funds exceeded its working capital requirements, it would have had an obligation to apply such excess funds to its continuing redemption obligation under Section 4(d). Once fiscal 2005 ended, however, ThoughtWorks was obliged to apply all legally available funds to its redemption obligation without regard to the working capital set-aside found in Section 4(a).

This reading of the document is entirely consistent with the evidence at trial relating to the negotiation and drafting of the document that clearly established the parties' intention that the working capital exclusion be limited to the fiscal year of the redemption date.[28] ThoughtWorks's offering memorandum included a mandatory seven-year redemption term and proposed a three-year pay out period.[29] SVIP responded with a term sheet providing for redemption in five years and no pay out period.[30] SVIP then prepared an initial draft of the charter that provided that on the fifth anniversary of the closing date "each holder of preferred stock shall be entitled to require the Corporation to redeem for cash out of any funds legally available therefor 100% of the Preferred Stock held by each holder."[31] Thought-

Works counter proposed to "revise this Section to provide that redemption payments will be made quarterly over a two year period unless the Company otherwise has the ability to pay accrued and unpaid dividends on the preferred stock."[32] This proposal was rejected by SVIP.

ThoughtWorks then proposed that the redemption provision be revised to contain language that ThoughtWorks "shall not be required to redeem Preferred Stock with legally available funds that are designated as working capital in the Corporation's budget."[33] This proposal states the very redemption right that ThoughtWorks argues the parties agreed to in the final executed agreement. But SVIP did not agree to this language. Instead, SVIP responded with a blacklined draft of the charter that contained a working capital set-aside only for the year of the redemption date. This contract language that SVIP proposed, and ThoughtWorks adopted, became the contract language ultimately incorporated in the final charter.

In addition, ThoughtWorks's conduct after the execution of the charter confirms that it did not believe the working capital exception applied beyond the fiscal year of the redemption date. Specifically, beginning in 2003, ThoughtWorks formulated contingency plans to deal with the redemption of the preferred shares—demonstrating its recognition that the working capital set-aside would not apply beyond the fiscal

---

**28.** At trial neither party presented evidence of discussions between the parties' lawyers as to whether the working capital set-aside would apply beyond 2005.

**29.** The court notes that this initial proposal by ThoughtWorks had a redemption provision that was arguably less generous to Thought-Works than the working capital carve out it *now seeks to impose on the provision it* subsequently negotiated with SVIP.

**30.** Goodwin testified that ThoughtWorks was agreeable to a redemption in five years with no pay out period.

**31.** JX 4; Tr. 26–27, 80, 241.

**32.** JX 5; Tr. 80–81.

**33.** Tr. 86–87; JX 9. ThoughtWorks explained, "in other words, legally available funds in excess of funds set aside as working capital will be available to redeem shares of preferred stock."

year of the redemption date. First, the board identified the redemption obligation as one of the company's top priorities and placed Loughmiller in charge of the "Solving the Put Program."[34] Second, ThoughtWorks made a power point presentation to SVIP entitled "Solving the Put Issue" which proposed delaying the exercise of the put for additional consideration so that ThoughtWorks could avoid a sale. Third, ThoughtWorks hired William Blair to raise capital through the issuance of debt to pay off the redemption obligation. Fourth, the company made a formal offer to the preferred stockholders to redeem their shares for $12.8 million in cash. Fifth, ThoughtWorks drafted a company-wide email to all employees stating that it was reducing variable pay to employees as a way of addressing "a big challenge to solve in the spring of next year: the 'Put.'"[35]

ThoughtWorks was unable, at trial, to present any evidence that it ever believed before the start of the litigation that the working capital carve-out applied beyond 2005. The working capital set-aside was not discussed in any board minutes, or with William Blair, or in the power point presentation ThoughtWorks made to SVIP in an attempt to negotiate a solution to the put problem, or in the confidential presentation Loughmiller made to the global leadership team, or in the company-wide email sent to all employees explaining the details of the put. What the record reveals is that ThoughtWorks claimed this right for the first time when it brought this litigation.

For all these reasons, the court concludes that the working capital set-aside applied only in fiscal year 2005, and, thus, ThoughtWorks must now redeem SVIP's preferred stock to the extent funds are legally available therefor.[36]

## B. Line Of Credit

■■ ThoughtWorks also seeks a declaration that Article IV, Section 5 of its certificate of incorporation does not provide the preferred stockholders with consent rights over the board's decision to enter into an operating line of credit, even one that substantially limits by contract its ability to apply any cash in satisfaction of its redemption obligation. It argues that the consent rights provided to the preferred stockholders in the charter do not extend to debt transactions of this type. According to ThoughtWorks, neither SVIP nor its lawyers, all of whom are sophisticated businesspeople with experience in transactions of this kind, negotiated for the right to consent to ThoughtWorks's incurrence of debt. In addition, ThoughtWorks argues that SVIP violated the implied duty of good faith and fair dealing by interfering with its right to obtain an increase in its line of credit. Because this last claim was not asserted in ThoughtWorks's complaint or in any submissions prior to trial, but rather was made for the first time in its post-trial brief, the court will not address it.

---

34. JX 27; Tr. 43, 97, 191–92.

35. JX 39. The email also stated that the put obligation was "coming due." The email was later amended due to concerns by SVIP about how it was being portrayed to ThoughtWorks's employees. Somers testified that this email, which informed the employees that their wages would be reduced, "seemed to put us [SVIP] in a light that was not favor- able, and we were very sensitive to being portrayed as the bad guy in the situation." Tr. 252–56, 276–77.

36. The question whether ThoughtWorks has legally available funds under Delaware law to apply to its redemption obligation was not at issue in this action.

SVIP responds that Section 5(j) of the charter requires that ThoughtWorks obtain the consent of a majority of the preferred stockholders if it enters into any contractual arrangement providing for the payment of $500,000 or more per year by either party if the transaction is either (1) outside the ordinary course of business or (2) not contemplated by the corporation's annual budget. SVIP contends that the decision to obtain a major line of credit falls within the parameters of Section 5(j) because it is a contractual arrangement that provides for the payment of $500,000 or more per year. SVIP argues that ThoughtWorks's decision to enter into a $10 million line of credit with LaSalle without first obtaining SVIP's consent violates both prongs of Section 5(f). Furthermore, SVIP argues that the previous dealings of the parties support its interpretation of the charter. Particularly, in the past, ThoughtWorks sought the consent of SVIP prior to entering into or increasing a line of credit.

Recognizing that the certificate of incorporation does not contain a prototypical material indebtedness provision, the court, nevertheless, concludes that ThoughtWorks's proposed $10 million line of credit falls within the scope of Section 5(j) [37] as a "contractual arrangement providing for the payment of $500,000 or more per year by either party." [38] ThoughtWorks's contention that Section 5(j) is only a material contracts provision and cannot be read to relate to the incurrence of material indebtedness is not persuasive. The plain language of the section clearly states that it broadly applies to "any contractual arrangement providing for the payment of $500,000 or more." Such contractual arrangements can be easily read to include debt transactions. [39] Therefore, if the line of credit is either outside of Thought-Works's ordinary course of business or not contemplated by ThoughtWorks's annual budget, ThoughtWorks must obtain prior consent from a majority of the preferred stockholders, or, in this case, SVIP.

Although only one of these conditions need be satisfied for the consent requirement of Section 5(j) to apply, the court finds that both conditions were met. First, no $10 million line of credit was contemplated in ThoughtWorks's budget. By ThoughtWorks's own admissions at trial, annual budgets had not been generated or presented to the holders of the preferred stock for approval pursuant to Section 5(f) of the charter since 2002. [40]

37. The court notes that the record is void of any communications between the drafting parties of the charter with respect to the negotiation of the minority investor protection provisions. Therefore, the court relies solely on the written record and the plain language of the charter.

38. Such a line of credit provides for the payment of $500,000 or more per year both by the issuing of the loan and the repaying of it.

39. The court also rejects ThoughtWorks's argument that the contemplated line of credit does not provide for the payment of $500,000 or more per year because the line of credit is not a payment to ThoughtWorks. Section 5(j) requires ThoughtWorks to obtain consent from a majority of the preferred stockholders if it enters into *"any contractual arrangement*

*providing for* the payment of $500,000 or more per year by either party thereto."* (emphasis added). It does not say that a payment of $500,000 or more must be made, but rather uses the terms an "arrangement providing for the payment" of $500,000 or more. A line of credit is a contractual arrangement with a financial institution whereby a credit facility is set up so that, at any time, the company can borrow money, which in this case was up to $10 million. Thus, to obtain this line of credit, ThoughtWorks would have to enter into "a contractual arrangement" with a bank that "provided for the payment of over $500,000 per year by either party."

40. Section 5(f) of the charter provides that a majority of the holders of the preferred stock must approve the annual operating and capital budgets of the corporation. JX 14.

Loughmiller testified at trial that, after ThoughtWorks had a disagreement with SVIP in 2002 over the budget, he decided not to present a budget to SVIP for its approval, even though he believed SVIP had a right under the charter to approve the budget. Instead, he explained that ThoughtWorks prepared what he called "operating plans," financial projections which were not approved by the majority of the preferred stockholders. Because those "operating plans" included Thought-Works's operating lines of credit, Thought-Works argues it did not need to obtain the consent of the preferred stockholders pursuant to Section 5(j) of the charter prior to obtaining them.

The court disagrees. The purpose of Section 5(j) is to ensure that major contractual agreements are approved by a majority of the preferred stockholders. That approval may take place either in the process of approving the budget, pursuant to Section 5(f), or later through the consent of a majority of the preferred stockholders. ThoughtWorks's position that it complied with Section 5(j) because it prepared "operating plans" that included lines of credit eviscerates the protections of Section 5 because it allows ThoughtWorks to enter into a significant transaction without obtaining either of the two approvals prescribed in the charter. In effect, Thought-Works's argument allows it to avoid seeking approval of its budget under Section 5(f) and also allows it to avoid seeking consent under Section 5(j) for a major

transaction. This is clearly inconsistent with the plain meaning of the charter.

Second, the evidence showed that a large line of credit, such as $10 million, is outside of ThoughtWorks's ordinary course of business. When SVIP invested in ThoughtWorks, the parties agreed that ThoughtWorks would use part of the proceeds for the repayment of all of the company's outstanding debt. In fact, ThoughtWorks's credit facility was extinguished as a condition of closing the transaction.[41] Thus, at the time of SVIP's investment, it was assumed by both parties that ThoughtWorks would not need to take on debt. However, the circumstances changed, ThoughtWorks did not go through with an IPO, and the financial condition of the company weakened. In 2003, ThoughtWorks sought SVIP's approval for a $3 million line of credit secured by the company's accounts receivable. SVIP objected to the size of the facility, and the parties agreed on a $1 million line of credit. Although Thought-Works did not obtain formal written consent from SVIP, the board resolved that ThoughtWorks would keep SVIP apprised of any drawing of funds on the $1 million line of credit.[42] A year later, Thought-Works negotiated with SVIP over obtaining a $5 million line of credit secured by the company's accounts receivable. The parties agreed on a $3 million line of credit. ThoughtWorks sought and obtained formal written consent from SVIP for this $3 million line of credit.[43] These facts clearly support a finding that any line of

41. ThoughtWorks's existing line of credit was paid down to zero and the credit facility with LaSalle was closed.

42. The terms of the agreement ThoughtWorks and SVIP reached were documented in a board resolution that stated:

The corporation must, prior to drawing funds against the line of credit, notify Schroder Ventures U.S. Fund LP 1 and Schroder Ventures U.S. Fund LP 2, in writing, via facsimile, e-mail, telephone or otherwise, regarding the amount of such funds to be drawn and the primary reasons therefor.
JX 23.

43. Tr. 67, 110–11, 274. Goodwin's testimony that "our attitude was—we explained [SVIP] didn't have a right to consent, but if they [SVIP] wanted to consent they could do so" is

credit fell outside the ordinary course of business, and thus required consent from a majority of the preferred stockholders.[44]

In August 2005, ThoughtWorks attempted to more than triple its existing line of credit by negotiating with LaSalle a $10 million line of credit secured by the company's accounts receivable.[45] This time, ThoughtWorks did not seek the preferred stockholders' approval. Thought-Works's proposal to obtain a $10 million line of credit secured by its accounts receivables without SVIP's consent was particularly objectionable because it made ThoughtWorks's redemption of SVIP's shares subject to the approval of La-Salle.[46] Eventually, SVIP was able to prevent Thoughtworks from obtaining the $10 million line of credit.

For all the foregoing reasons, the court concludes that Section 5(j) of the certificate of incorporation requires Thought-Works to obtain the consent of the majority of the holders of the preferred stock before obtaining any new line of credit.

## IV.

Based on the reasons set forth herein, the court denies ThoughtWorks's request-

ed declaratory relief on both the redemption and the line of credit issues, and enters judgment in favor of SVIP. Counsel for SVIP are directed promptly to submit a form of judgment order, on notice.

---

contradictory to his actions and the documentary evidence presented at trial. Goodwin wrote an email to SVIP's Nick Somers and Kathleen Stowe, at 10:17 p.m. the day before the board obtained the $3 million line of consent, which stated:

> Here are the preferred shareholder consent and the exhibit (which contains the blank resolution). We are trying to get this out at 9:30 am, Chicago time. Please call my cell if you have any questions. Thank you for your attention to this.

JX 34. Goodwin's request for consent by 9:30 the next morning is not the action of a corporate executive who believes SVIP "did not have a right to consent, but if they wanted to consent they could do so." Clearly, Goodwin believed he needed official consent from SVIP for the line of credit, and SVIP provided this immediate consent. JX 36.

**44.** In addition, the company-wide email to all ThoughtWorks's employees stated that "our agreement with SVUS contains certain covenants which put restrictions upon certain activities ... things that require their approval before we proceed. This includes things like getting a line of credit against our receivables." JX 39.

**45.** Tr. 8–9. Goodwin testified that Thought-Works essentially has no other assets than its people, and thus its accounts receivables are significant to the company.

**46.** JX 67, 199–200. The line of credit agreement provided that "cash flows used to pay the redemption obligation must be an amount acceptable to the Bank." Therefore, the proposed line of credit would create an obstacle to ThoughtWorks's redemption of SVIP's shares.