## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| COMPOSECURE, L.L.C., | ) | |
| | ) | |
| Plaintiff/Counterclaim Defendant, | ) | |
| | ) | |
| v. | ) | C.A. No. 12524-VCL |
| | ) | |
| CARDUX, LLC f/k/a AFFLUENT CARD, LLC, | ) | |
| | ) | |
| Defendant/Counterclaim Plaintiff. | ) | |

## REPORT ON REMAND

Date Submitted: May 9, 2019
Date Decided: June 5, 2019

Myron T. Steele, Berton W. Ashman, Jr., Andrew H. Sauder, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; Steven M. Coren, KAUFMAN, COREN & RESS, P.C., Philadelphia, Pennsylvania; *Attorneys for Plaintiff/Counterclaim Defendant*.

David J. Margules, Elizabeth A. Sloan, Jessica C. Watt, BALLARD SPAHR LLP, Wilmington, Delaware; *Attorneys for Defendant/Counterclaim Plaintiff.*

**LASTER, V.C.**

The Delaware Supreme Court remanded this case with instructions to determine whether the Sales Agreement required special approvals under the Restricted Activities Provision.[1] This report finds that the Sales Agreement was not subject to the Restricted Activities Provision because it did not require CompoSecure to expend more than $500,000 in any fiscal year.

The Restricted Activities Provision called for the Board to adopt an annual budget and an annual business plan. LLCA § 4.1(p). Except as set forth in the annual budget or the annual business plan, CompoSecure could not undertake any action that fell within a list of "Restricted Activities" without "the prior approval of the Board and Investors (and during the Earnout Period, the Class A Majority) . . . ." *Id.* The list of eighteen "Restricted Activities" included "enter[ing] into . . . any contract, agreement, arrangement or understanding requiring the Company . . . to make expenditures in excess of $500,000 during any fiscal year, other than in the ordinary course of business consistent with past practice . . . ." *Id.* § 4.1(p)(ix)(A).

The Sales Agreement did not receive prior approval from the Board, the Investors, or the Class A Majority. The evidence at trial established that all three groups in fact supported the Sales Agreement and would have provided the formal approvals had anyone flagged the issue. The vote of the Class A Majority was controlled by CompoSecure's

---

[1] *CompoSecure, L.L.C. v. CardUX, LLC*, --- A.3d ---, 2018 WL 5816740, at *2 (Del. Nov. 7, 2018). Capitalized terms used in this decision, unless defined herein, have the same meaning as in the Delaware Supreme Court's decision. "LLCA" refers to the LLC Agreement. "SA" refers to the Sales Agreement.

CEO, Michelle Logan; she participated in the negotiations over the Sales Agreement, signed it on behalf of CompoSecure, and supported it. The vote of the Investors was controlled by a private equity firm; Mitchell Hollin represented the firm, negotiated the final terms of the Sales Agreement, and supported it. The Board was briefed on the Sales Agreement and supported it. The Board members included Logan and her father as well as Hollin and one of his fellow managing directors from the private equity firm. To reiterate, the only reason that the formal approvals were not obtained is because no one focused on them at the time. *See CompoSecure, L.L.C. v. CardUX, LLC* (*Trial Op.*), 2018 WL 660178, at *6–8, *13–14 (Del. Ch. Feb. 1, 2018).

After the parties signed the Sales Agreement, everyone treated it as valid. That changed only after CompoSecure accepted a major order—the Amazon Sale—that triggered a multi-million-dollar commission for CardUX. At that point, CompoSecure began coming up with reasons not to pay. *See id.* at *16, *18. After hiring litigation counsel, CompoSecure asserted for the first time that the Sales Agreement had never received the approvals required by the LLC Agreement. *Id.* at *18.

The Sales Agreement did not require prior approvals under the Restricted Activities Provision because it did not require expenditures of more than $500,000 in any fiscal year. When analyzing a provision in an LLC agreement, "a court applies the same principles that are used when construing and interpreting other contracts." *Godden v. Franco*, 2018 WL 3998431, at *8 (Del. Ch. Aug. 21, 2018). "When interpreting a contract, the role of a court is to effectuate the parties' intent." *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del. 2006). Absent ambiguity, the court "will give priority to the parties'

2

intentions as reflected in the four corners of the agreement, construing the agreement as a whole and giving effect to all its provisions." *Salamone v. Gorman*, 106 A.3d 354, 368 (Del. 2014) (internal quotation marks omitted). The "contract's construction should be that which would be understood by an objective, reasonable third party." *Id.* at 367–68 (internal quotation marks omitted). The contract's "terms themselves will be controlling when they establish the parties' common meaning so that a reasonable person in the position of either party would have no expectations inconsistent with the contract language." *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997). A court will "construe the contract in accordance with that plain meaning and will not resort to extrinsic evidence to determine the parties' intentions." *BLG Hldgs. LLC v. enXco LFG Hldg., LLC*, 41 A.3d 410, 414 (Del. 2012). "To be ambiguous, a disputed contract term must be fairly or reasonably susceptible to more than one meaning." *Alta Berkeley VI C.V. v. Omneon, Inc.*, 41 A.3d 381, 385 (Del. 2012).

The operative term in the Restricted Activities Provision is "requiring." That verb is a commonly used word with a clear meaning. Something required is necessary or essential, and a requirement is something that must take place.[2] In the context of the

---

[2] *See, e.g.*, Merriam-Webster, https://www.merriam-webster.com/dictionary (last visited May 21, 2019) (defining "require" as "to demand as necessary or essential," and "requirement" as "something essential to the existence or occurrence of something else"); *Requirement*, BLACK'S LAW DICTIONARY (10th ed. 2014) ("Something that must be done because of a law or rule; something legally imposed, called for, or demanded; an imperative command <building requirements specified in the Americans with Disabilities Act>"; "Something that someone needs or asks for <the new telephone system meets all our requirements>"; "Something, such as good test results, that an employer, university, etc. sets as a necessary qualification; a requisite or essential condition <fulfilling the

3

Restricted Activities Provision, a contract "requiring the Company . . . to make expenditures in excess of $500,000 during any fiscal year" is a contract that mandates spending in that amount, without any contingencies, conditions, or optionality. LLCA § 4.1(p)(ix)(A).

The Sales Agreement only required CompoSecure to make two expenditures: (i) an annual expense reimbursement capped at $20,000 and (ii) a commission advance of $10,000 per month during the first fifteen months. SA §§ 4.2(a), 6.2(a). The Sales Agreement thus required total expenditures falling well below the threshold in the Restricted Activities Provision.

CompoSecure claims that the Sales Agreement required CompoSecure to pay commissions and points out that the commission for the Amazon Sale exceeds $500,000. It is true that the Sales Agreement contemplated commissions, but any payment obligation was doubly conditional. CompoSecure only would have an obligation to pay a commission if two contingencies were met. First, an "Approved Prospect" would have to place an order. Second, CompoSecure would have to accept the order.

The first condition—receipt of an order from an Approved Prospect—meant that neither CardUX nor CompoSecure could unilaterally cause any commission payment to be

requirements for college admission>"; "The act of establishing something as a need or necessity; a demand <the requirement by management that no children under 10 be allowed at our workplace>"); *Require*, BLACK'S LAW DICTIONARY (5th ed. 1979) ("To direct, order, demand, instruct, command, claim, compel, request, need, exact"; "To be in need of"; "To ask for authoritatively or imperatively").

4

required. Because of the second condition, CompoSecure could unilaterally block any commission from being due, but neither CardUX nor CompoSecure could single-handedly cause a commission to be due. Whether anyone placed an order was an eventuality entirely within the control of the third parties who might order cards, and only orders placed by third parties found on the list of Approved Prospects could satisfy the first condition. Absent an order from an Approved Prospect, CompoSecure would never be required to pay a commission. The existence of the Sales Agreement, standing alone, did not require a commission payment.

The second condition—a decision by CompoSecure to accept the order—gave CompoSecure the ability to determine unilaterally whether it would ever be required to pay a commission. Section 5.1 of the Sales Agreement specified that "[a]ll purchase orders solicited by [CardUX] from Approved Prospects are subject to approval, rejection or modification by CompoSecure pursuant to Section 5.2." Section 5.2 stated: "CompoSecure reserves the right, in its sole discretion, to: (a) accept, or decline to accept, any purchase order for Products received from any Person . . . ." CompoSecure undertook only to "review proposed projects and purchase orders submitted through [CardUX] consistent with the manner in which it conducts its business in the ordinary course." *Id.* § 5.2. CardUX acknowledged in the same provision that "CompoSecure's exercise of discretion may result

in no Commission owed, or a reduction or delay in the payment of Commission owed, to [CardUX] under this Agreement."[3]

Because of the second condition, CompoSecure could never be required to pay a commission unless CompoSecure determined that the order from an Approved Prospect provided sufficient value to CompoSecure to warrant accepting the order and making the commission payment. *See Trial Op.*, 2018 WL 660178, at *37 ("CardUX receives compensation only if CompoSecure determines that a sale is beneficial."). CompoSecure might decline an order for myriad potential business reasons. An order might seek discounts that would not be sufficiently profitable for CompoSecure. Or an order might require product changes or increased capacity that would necessitate additional investment by CompoSecure and distract from other opportunities. If CompoSecure declined an order, which it could do in its "sole discretion," then CompoSecure would not be required to make any payment to CardUX.

The Amazon Sale illustrates these principles. The Amazon Sale was an extremely large order which required that CompoSecure ramp up its manufacturing capacity. The order also came through Chase, and CompoSecure was trying to develop other channels to

---

[3] *Id.* CompoSecure argues that because of its relationship with Chase, it would have been contrary to the ordinary course of its business to reject the order that led to the Amazon Sale. Section 5.2 of the Sales Agreement required CompoSecure to "review" an order in a manner consistent with how CompoSecure conducted its business in the ordinary course. The ordinary-course requirement covered the review process, not the acceptance of orders. CardUX introduced this provision out of concern that CompoSecure might delay its review of an order to take it outside the contractual payment period. CompoSecure reserved for itself the "sole discretion" to reject any order it wished.

reduce the percentage of cards that CompoSecure sold through Chase. Because of the concentration issue, CompoSecure initially attempted to steer the Amazon business away from Chase to another issuer. When that effort failed, CompoSecure's management team decided that the order was so profitable that it was worth accepting, even though it required increased capacity, even though it came through Chase, and even though it triggered CardUX's right to a commission. As Logan told Hollin, "Oh boy Mitchell . . . . I know that we are trying to decrease the customer concentration but it's hard to say no to 70% margin business." *Id.* at *15.

When the parties entered into the Sales Agreement, CompoSecure was not required to pay any commissions to CardUX, and it certainly was not required to pay a commission for the Amazon Sale. To reiterate, CompoSecure did not have any obligation to pay commissions to CardUX unless two conditions were met: first, an order from an Approved Prospect, and second, a decision by CompoSecure to accept that order. Both conditions were beyond CardUX's control. The first was a third-party decision; the second rested in CompoSecure's sole discretion. For the Amazon Sale, the first contingency was not satisfied until CompoSecure received the order for the Amazon Sale. The second contingency was not satisfied until CompoSecure decided to accept the order.

To argue for the opposite result, CompoSecure cites documents from the early phases of negotiations over the Sales Agreement when the parties were discussing different concepts, such as a fully outsourced sales function. In those documents, principals of CardUX made back-of-the-envelope projections about the potential revenue opportunity, which they viewed as large, and which (if achieved) could have resulted in commission

7

payments of more than $500,000 per year. Those documents are preliminary, speculative, and remote from the final Sales Agreement, both temporally and conceptually. Regardless, they could not create a requirement that CompoSecure make any commission payments. They at most represented one side's expectations during an early phase of the negotiations. Projections are predictions, not requirements. Under the Sales Agreement, CompoSecure's obligation to pay a commission did not depend on projections. It only would arise if (i) an Approved Prospect placed an order that (ii) CompoSecure decided to accept.[4]

_____

[4] CompoSecure formally disclaims any effort to turn expectations into requirements, but its briefs belie that assertion. *See* Dkt. 186 at 6 (contending that "the parties reasonably expected" commissions exceeding $500,000 in any fiscal year); *id.* at 45 (asserting that "the surrounding circumstances confirm that commissions in excess of $500,000 were *contemplated* by the Sales Agreement in any fiscal year" (emphasis added)); *see also* Dkt. 194 at 10 ("But *once* the Amazon Sale was accepted, the obligation to pay the commission was established as *required* under Section 6.1 of the agreement." (first emphasis added)).

CompoSecure argued tersely and for the first time in its reply on remand that "the Amazon Sale was itself a Restricted Activity" because it was an "arrangement" requiring CompoSecure to pay a commission in excess of $500,000. Dkt. 194 at 11. Addressing this issue would exceed the scope of the remand, which directed "the trial court to determine whether the Sales Agreement is a Restricted Activity and to make any necessary related determinations." *CompoSecure*, 2018 WL 5816740, at *2. Although the Delaware Supreme Court authorized this court "to consider any ancillary issues that arise on remand," it did not authorize the consideration of new, independent bases to challenge a commission payment to CardUX. *See id.* at *12 n.76.

Assuming for the sake of argument that the remand could encompass CompoSecure's new contention, I would reject it. The Amazon Sale standing alone was not an "arrangement" requiring the payment of a commission. The Amazon Sale was an order that triggered a commission under a different arrangement: the contractual arrangement found in the Sales Agreement. It is possible that the Amazon Sale might qualify in its own right as a Restricted Activity, but if there were problems under the Restricted Activities Provision, then those problems would infect the Amazon Sale as a whole. In that event, CompoSecure would have to approach Amazon and invalidate the sale. CompoSecure could not treat the Amazon Sale as valid for all purposes except for the

CompoSecure also cites the *ThoughtWorks* decision, in which a corporation's charter contained a restricted-activities provision requiring "the consent of a majority of the preferred stockholders if it enters into any contractual arrangement providing for the payment of $500,000 or more per year by either party if the transaction is either (1) outside the ordinary course of business or (2) not contemplated by the corporation's annual budget." *ThoughtWorks, Inc. v. SV Inv. P'rs*, 902 A.2d 745, 755 (Del. Ch. 2006). The corporation entered into a $10 million line of credit without obtaining the preferred stockholders' consent. The corporation argued that the line of credit did not call for any "payment" by ThoughtWorks, because it was only a line of credit. This court disagreed, stressing that the restricted-activities provision was not limited to payments but rather encompassed "*any contractual arrangement providing for* the payment of $500,000 or more per year by either party thereto." *Id.* at 755 n.39. The court explained that this provision encompassed the contractual arrangement embodied in a line of credit:

> A line of credit is a contractual arrangement with a financial institution whereby a credit facility is set up so that, at any time, the company can borrow money, which in this case was up to $10 million. Thus, to obtain this line of credit, ThoughtWorks would have to enter into "a contractual arrangement" with a bank that "provided for the payment of over $500,000 per year by either party."

---

commission payment due to CardUX. Conversely, if the Amazon Sale was valid for purposes of CompoSecure's relationship with Amazon, then it should be valid for purposes of the commission payment to CardUX. CompoSecure is not suggesting that the Amazon Sale as a whole was invalid. CompoSecure cannot have it both ways.

*Id.* The court also held that the line of credit did not fall within either of the exceptions to the approval requirement. *Id.* at 755–57.

As CompoSecure reads the case, *ThoughtWorks* shows that a restricted-activities provision can extend to an arrangement that does not require an immediate payment but rather contemplates one in the future. CompoSecure argues that under its interpretation of *ThoughtWorks*, the Restricted Activities Provision should apply to the Sales Agreement, because the Sales Agreement contemplated future commission payments if the necessary conditions were met.

This argument is not persuasive. As a textual matter, it ignores the different language in the two restricted-activities provisions. In *ThoughtWorks*, the operative language covered any "contractual arrangement providing for the payment of $500,000 or more per year." In this case, the operative language covers "any contract . . . requiring the Company . . . to make expenditures in excess of $500,000 during any fiscal year." The latter is a narrower standard than the former, with the provision in this case "requiring" the expenditure rather than more broadly encompassing an "arrangement providing for" the expenditure. The *ThoughtWorks* court cited the relative breadth of the provision it interpreted when holding that it applied to the revolving line of credit. *See id.* at 755.

As a contextual matter, CompoSecure's reliance on *ThoughtWorks* ignores a key structural difference between the revolving line of credit and the Sales Agreement. Once ThoughtWorks entered into the line of credit, its management team could draw on it at will, creating the obligation that the restricted-activities provision protected against. Because it was an open line of credit, management could draw on the line, pay it back, draw on it

10

again, and continue repeating that process, each time acting unilaterally. For purposes of the restricted-activities provision, entering into the credit line created an unimpeded path to the financial obligation that the restricted-activities provision sought to limit.

The potential obligation to pay commissions under the Sales Agreement is different. Even after CompoSecure entered into the Sales Agreement, CompoSecure would not be required to make any commission payments based on unilateral action by either CardUX or CompoSecure. A commission payment only would become due if (i) an Approved Prospect placed an order *and* (ii) CompoSecure chose to accept it in the exercise of its sole discretion. CardUX had no ability to force a payment, and CompoSecure remained protected by its sole-discretion approval right. Going forward, CompoSecure could decide whether or not to sell to an Approved Prospect, and it only would need to pay a commission if CompoSecure determined that the sale was sufficiently beneficial to warrant accepting, taking into account the obligation to make the commission payment that would arise if CompoSecure accepted.

Given the different structures of the two contracts, the analysis of the line of credit in *ThoughtWorks* is not a persuasive precedent for the Sales Agreement in this case. Instead, the contrast with *ThoughtWorks* helps illustrate why applying the Restricted Activities Provision would be inconsistent with its purpose. In *ThoughtWorks*, the management team's interest in using the company's cash to run its business ran contrary to the preferred stockholders' desire to have that cash used to redeem their shares. The management team entered into the line of credit because it provided a source of operating cash that would not increase the company's redemption obligation, since the increased cash

11

would be offset by the increased debt. The restricted-activities provision gave the preferred the ability to block significant decisions where management's interests might diverge from the preferred's. Applying the restricted-activities provision to the revolving line of credit fulfilled the provision's purpose.

In the current case, the Restricted Activities Provision theoretically serves a similar purpose by ensuring that the management team cannot commit CompoSecure to make a major expenditure without the approval of the Investors, the Class A Majority, and the Board. But that purpose is not implicated by the facts of this case, where every one of those constituencies was involved in the negotiation of the Sales Agreement and wanted to go forward with the contract. CompoSecure's decision to enter into the Sales Agreement was the antithesis of a management team acting unilaterally to commit CompoSecure to a major expenditure without the oversight of its owners. CompoSecure's management team and its owners were aligned on and uniformly supported the decision to enter into the Sales Agreement. Everyone whom the Restricted Activities Provision was designed to protect had the opportunity to protect themselves at the time through their direct involvement in the transaction. They also had the ability to protect themselves on an ongoing basis by causing CompoSecure to reject any order from an Approved Prospect that was not advantageous to CompoSecure. Having chosen to go forward with the Sales Agreement, and having chosen to go forward with the Amazon Sale, CompoSecure's management team and its owners are now invoking the Restricted Activities Provision in an effort to enable their current selves to escape the consequences of actions taken by their former selves.

12

Because the Sales Agreement did not fall within the scope of the Restricted Activities Provision, that section of the LLC Agreement did not require any additional approvals, and it was not void because of a failure to obtain them. Given the outcome on this question, this report does not reach the other issues raised or arguments advanced by the parties.